**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**July 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**FOR THE TENTH CIRCUIT**
_____

HAL JENKINS; CLJ
HEALTHCARE, LLC,

    Plaintiffs - Appellants,

v.

PRIME INSURANCE COMPANY;
PRIME HOLDINGS INSURANCE
SERVICES, INC., d/b/a Claims
Direct Access; DAVID MCBRIDE;
EVOLUTION INSURANCE
BROKERS, LC,

    Defendants - Appellees.

No. 25-4064

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:21-CV-00130-RJS)**
_____

Kathryn Hughes Pinckney (Brent J. Savage and Zachary R. Sprouse with
her on the briefs), Savage & Tuner, P.C., Savannah, Georgia, for
Plaintiffs-Appellants.

Alex Trumbo (Andrew D. Wright and Andrew B. McDaniel with him on the
brief), Strong & Hanni, Sandy, Utah, for Defendants-Appellees.
_____

Before **TYMKOVICH**, **MURPHY**, **BACHARACH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This appeal involves an insurer's duty to deal in good faith with its insured—a surgery center. The duty arose from the death of a patient following surgery. The death led the patient's father to sue the surgery center,[1] triggering liability coverage.

The insurer offered the maximum provided by the policy, but the patient's father rejected the offer. Given this offer, can the insurer incur liability for bad faith? We answer *no*.

1.    **A liposuction surgery spurs litigation, settlement negotiations, and a judgment against the surgery center.**

The suit began with liposuction surgery for Ms. April Jenkins. She went into arrest during the surgery and died later that day. Her father, Mr. Hal Jenkins, negotiated through his attorney with the surgery center's insurer, Prime Insurance Company. The policy was limited to $50,000 for each occurrence, but the coverage was reduced with each dollar spent in defense.

After negotiating for months, Mr. Jenkins sued the surgery center (CLJ Healthcare, LLC). Prime Insurance offered the entire policy limit, and Mr. Jenkins rejected the offer.

The next month, the medical examiner issued a report, attributing the death to natural causes. The surgeon said that she considered this

---

[1]    The father also sued the surgeon.

conclusion as exoneration. But two months later, Prime Insurance tendered the rest of the coverage to CLJ, stating that it could freely decide how to use the insurance proceeds in negotiating with Mr. Jenkins.

Mr. Jenkins' attorney learned that CLJ had coverage not only with Prime Insurance, but also with Owners Insurance Company. Owners Insurance had issued a liability policy with a $2 million limit; and Mr. Jenkins demanded the $2 million from Owners Insurance, adding a contingency for Prime Insurance to tender $100,000. Owners Insurance denied coverage and rejected the demand.

CLJ then entered an agreement with Mr. Jenkins: He would get an assignment of CLJ's right to assert a bad-faith claim against Prime Insurance, and CLJ would decline to defend itself in a suit for malpractice. After entering into the agreement, Mr. Jenkins sued CLJ for malpractice and obtained an uncontested judgment for $60 million.

## 2.    Mr. Jenkins and CLJ sue Prime Insurance for bad faith.

Mr. Jenkins and CLJ then sued Prime Insurance for bad faith.[2] Prime Insurance responded that the claim was time-barred, and the court agreed. Mr. Jenkins and CLJ appealed; and we reversed, concluding that the bad-faith claim was timely. *Jenkins v. Prime Ins., Co.*, No. 23-4113, 2024 WL 4040386, at *6–8 (10th Cir. Sept. 4, 2024). On remand, the district court

---

[2]    Mr. Jenkins also asserted other claims. But this appeal involves only the claim of bad-faith.

granted summary judgment to Prime Insurance and a related entity (Prime Holdings Insurance Services). Mr. Jenkins and CLJ appeal.

### 3.   We independently apply the standard for summary judgment.

We conduct de novo review of the district court's grant of summary judgment, applying the same standards as the district court. *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023). Summary judgment is properly granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether the movant made this showing, "we examine the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

### 4.   We apply Utah law regarding an insurer's obligations to its insured.

Prime Insurance's policy says that it should be construed and enforced under Utah law, Appellants' App'x vol. 7, at 174, and the parties agree on the enforceability of this provision. But Mr. Jenkins argues that the district court erred in applying Utah law.

Under Utah law, insurers bear an implied obligation to act in good faith. *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). That obligation includes diligent investigation to decide whether to settle. *Jones*

*v. Farmers Ins. Exch.*, 286 P.3d 301, 304 (Utah 2012). The nature of that obligation depends on

- whether Prime Insurance was covering an insured for its own loss or for liability to a third party and

- whether a third party has sued the insured.

*Black v. Allstate Ins. Co.*, 100 P.3d 1163, 1170 (Utah 2004).

The policy protected CLJ from liability rather than its own losses. Liability coverage is treated differently before and after Mr. Jenkins had sued. Before he sued, Prime Insurance's duties had been contractual. *Id*. But after Mr. Jenkins had sued, the duty created a foundation for tort liability involving breach of the duty of good faith. *Id*.

The parties disagree over the relevance of Prime Insurance's actions before Mr. Jenkins sued. He and CLJ argue that the actions prior to suit could support tort liability, and Prime Insurance disagrees. We assume for the sake of argument that Mr. Jenkins and CLJ are right and consider the handling of the claim before CLJ sued.

**5. Prime Insurance is entitled to summary judgment.**

The district court properly concluded that Prime Insurance hadn't acted in bad faith.

5

**Explanation of the policy's terms**

The policy capped coverage at $50,000, including the money that Prime Insurance had spent defending CLJ. But Mr. Jenkins and CLJ argue that Prime Insurance should have explained these provisions.

The Utah Supreme Court hasn't squarely addressed an insurer's duty to explain the terms of an insurance policy. So we must "attempt to predict what the state's highest court would do." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003).

In making that prediction, we consider

- the Utah Supreme Court's treatment of an insured's failure to read an application,

- that court's treatment of insurance policies as contracts,

- the majority view in other jurisdictions, and

- the scholarly commentary.

*See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006) (considering analogous decisions by the state's highest court); *Van Zanen v. Qwest Wireless, LLC*, 522 F.3d 1127, 1132 (10th Cir. 2008) (considering the majority view); *Menne v. Celotex Corp.*, 861 F.2d 1453, 1464 n.15 (10th Cir. 1988) (considering scholarly commentary). Applying these considerations, we predict that the Utah Supreme Court would not ordinarily require an insurer to explain the policy terms absent an ambiguity or evidence of fraud.

6

First, even when an insured hasn't read an application, the Utah Supreme Court has held that the terms are binding because policyholders are responsible for reading their policies. *See Theros v. Metro. Life Ins. Co.*, 407 P.2d 685, 688 (Utah 1965) (applying "the majority rule that an insured is under a duty to read his application before signing it, and will be considered bound by a knowledge of the contents of his signed application"); *see also Allen v. Prudential Prop. & Cas. Ins. Co.*, 839 P.2d 798, 806 (Utah 1992) (rejecting an insured's argument that a policy's exclusion did not apply because an agent had failed to clarify the policy's terms and observing that the Utah Insurance Code "expresse[d] an intent that 'freedom of contract' be maintained . . . and that written contracts be the primary means by which this freedom to contract be exercised" (quoting Utah Code Ann. § 31A–1–102(7))).

Second, the Utah Supreme Court has treated an insurance policy as a contract and presumed that the contracting parties understood the terms. *U.S. Fid. v. U.S. Sports Specialty*, 270 P.3d 464, 469–70 (Utah 2012); *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1047 (Utah 1985).

Third, most jurisdictions relieve insurers of a duty to explain the policy terms absent an ambiguity:

- Catherine Spain, *Reasonable Expectations in the Sphere of Liberty*, 198 Conn. Ins. L.J. 657, 678 n.140 (2006) ("In most jurisdictions, if the terms of a policy are clear, explicit, and

unambiguous, the insurer has no duty to explain the policy or its exclusions to the insured." (citing Robert H. Jerry, II, *Understanding Insurance Law* 236 (3d ed. 2002)))

- Kuan-Chun Chang, *Commentaries on the Recent Amendment of the Insurance Law of the People's Republic of China Regarding Insurance Contracts from the Perspective of Comparative Law*, 10 Wash. U. Global Stud. L. Rev. 749, 776–77 (2011) ("In the United States, the majority of courts have ruled that the insurer bears no affirmative duty to explain the policy or its exclusions to the insured if the terms in an insurance policy are clear, unambiguous, and explicit.")

Fourth, the leading scholarship on insurance law rejects a duty to explain policy terms to an insured:

- Jeffrey E. Thomas & Francis J. Mootz III, eds., 1 *New Appleman on Insurance Law* § 3.01[1][d], at 3-22 (2025) ("[I]nsurers generally are not required to explain policy terms before the contractual relationship begins or after a loss occurs.")

- Allan D. Windt*, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 2:2 (6th ed. 2025) ("In general, an insurer is . . . not obligated to advise the insured of its contractual obligations under the policy.")

Given these four considerations, we predict that the Utah Supreme Court wouldn't ordinarily require an insurer to explain the policy terms absent an ambiguity or evidence of fraud. And Mr. Jenkins doesn't identify any ambiguities in the policy language or suggest that Prime Insurance misrepresented the terms. So Prime Insurance didn't need to explain the policy terms to CLJ.

In similar circumstances, we have held that an insurer was entitled to summary judgment on a claim of bad faith. *Sec. Ins. Co. of Hartford v.*

8

*Wilson*, 800 F.2d 232, 235 (10th Cir. 1986). There we considered a bad-faith claim under Wyoming law based on an insurer's failure to explain an exclusion. *Id.* at 232, 235. We reasoned that the insurer couldn't breach a duty of good faith and fair dealing by failing to explain a provision that the insureds should have understood if they had read the policy. *Id.* at 235.

The same reasoning applies here because CLJ could have read the policy and asked Prime Insurance for an explanation if one was needed. After all, Prime Insurance had explained the coverage to CLJ in a memo and a binder stating that the coverage

- was limited to $50,000 for each occurrence and

- would be reduced by claim expenses as outlined in the policy.

Appellants' App'x vol. 9, at 117–21.

Prime Insurance didn't need to explain the coverage, but the undisputed evidence shows that Prime Insurance did provide an explanation. So Prime Insurance didn't act in bad faith by failing to explain the policy terms to CLJ.

**Failure to offer the policy limit in April 2013**

Mr. Jenkins and CLJ also contend that Prime Insurance should have offered the $50,000 policy limit in April 2013 and consulted CLJ about the status of Mr. Jenkins' claim. For this contention, Mr. Jenkins and CLJ point to an email that Mr. Jenkins' attorney sent to Prime Insurance: "I think . . . you should tender your limits for a limited release in the next

9

two weeks." Appellants' App'x vol. 4, at 71. Prime Insurance responded that it would be happy to consider a reasonable settlement demand depending on what the medical examiner found. *Id.* at 72.

Mr. Jenkins and CLJ characterize Prime Insurance's response as a failure to promptly investigate and make reasonable efforts to settle. In their view, Prime Insurance "inflamed the situation" by forcing Mr. Jenkins to sue. Appellants' Opening Br. at 36. But Mr. Jenkins didn't make an offer and Prime Insurance appropriately responded that it would consider a reasonable demand based on the medical examiner's upcoming report.

First, there is no evidence of an offer by Mr. Jenkins to settle the claim for the $50,000 policy limit. The email from his attorney stated only that Prime Insurance should make an offer; the email didn't say that Mr. Jenkins would release CLJ in exchange. *See* 1 *Williston on Contracts* 4:10 (4th ed. 2025) (stating that "general expressions of willingness to enter into a bargain upon stated terms" are just invitations to make an offer rather than an actual offer); *see also DCM Inv. Corp. v. Pinecrest Inv. Co.*, 34 P.3d 785, 789 (Utah 2001) (stating that the terms of an offer "must be definite and unambiguous").

Second, Mr. Jenkins conceded in oral argument that he would not have accepted a $50,000 offer because he thought that the policy limit was $100,000. Oral Arg. Tr. at 5:05–6:50. And Mr. Jenkins acknowledges that

10

Prime Insurance responded on the same day by explaining that the policy limit was $50,000 and would drop as defense costs were incurred. Appellants' Opening Br. at 7; *see* Appellants' App'x vol. 4, at 72 (Prime Insurance emailing a response within 1½ hours).[3]

Third, after receiving the email, Prime Insurance explained that it was waiting to review the findings of the medical examiner. Appellants' App'x vol. 4, at 72.[4] The surgeon told Prime Insurance that the death had probably resulted from a bad batch of anesthetic (propofol), and the eventual medical report attributed the death to natural causes. *See id.* at 2, 107c–107x; Appellants' App'x vol. 5, at 87–88. Prime Insurance thus didn't act unreasonably by stating at the time that it would consider Mr. Jenkins' request based on the medical examiner's findings.[5]

---

[3]    Though Prime Insurance promptly told Mr. Jenkins' attorney that the policy limit was $50,000, his expert witness opines that Prime Insurance should have "accept[ed] the $100,000 settlement demand." Appellants' App'x vol. 8, at 96. This amount would have doubled the policy limit.

[4]    Mr. Jenkins argues that Prime Insurance should have responded by offering the policy limit without waiting on the medical examiner. But Mr. Jenkins' attorney had told Prime Insurance that he would be talking to the medical examiner in two days. Appellants' App'x vol. 4, at 71.

[5]    Arguing that Prime Insurance should have offered the policy limit in April 2013, Mr. Jenkins relies in part on expert reports and testimony. Appellants' Opening Br. at 45–47. For his argument, Mr. Jenkins assumes that he would have settled the claim for the policy limit. But Mr. Jenkins didn't tell Prime Insurance that he would have accepted the policy limit to settle the claim against CLJ.

**Failure to advise CLJ that it could contribute its own funds to a settlement**

Roughly a year later, Mr. Jenkins offered to settle with another insurer (Owners Insurance) for $2 million, "contingent" upon Prime Insurance "tendering its available limits of $100,000." *Id.* at 113. Owners Insurance disclaimed any coverage,[6] and Prime Insurance tendered the remaining coverage (roughly $39,000). Appellants' App'x vol. 6, at 68. Mr. Jenkins doesn't deny that Prime Insurance offered all of the remaining coverage. But Mr. Jenkins argues that Prime Insurance should have told CLJ and the surgeon that they could contribute their own funds to make up the difference with Mr. Jenkins' offer (roughly $61,000). This argument rests on a distortion of Mr. Jenkins' actual offer and Prime Insurance's role as the insurer.

Mr. Jenkins directed the offer to Owners Insurance, a separate insurer, for $2 million. The reference to Prime Insurance was only as a "contingency" for the settlement between Mr. Jenkins and Owners

---

[6]     Mr. Jenkins and CLJ fault Prime Insurance for failing to remind CLJ that it had a separate insurance coverage through Owners Insurance. But the surgeon said under oath that a potential claim under the Owners Insurance policy had been reported within days of the surgery. Appellants' App'x vol. 6, at 157–58. And CLJ's broker explained that Owners Insurance hadn't "provide[d] insurance for medical malpractice claims." Appellants' App'x vol. 10, at 139 (*Jenkins v. CLJ Healthcare, LLC*, No. 20-13745, 2021 WL 3661074, at *1 (11th Cir. Aug. 18, 2021) (per curiam)).

Insurance. *See* Appellants' App'x vol. 4, at 113. Prime Insurance had no reason to think that CLJ and the surgeon could have settled with Mr. Jenkins by paying him roughly $61,000 because Mr. Jenkins was making a global offer for $2.1 million, not a separate offer to Prime Insurance for $100,000.

In any event, Mr. Jenkins sent the offer to CLJ as well as to Prime Insurance.[7] Granted, CLJ might not have understood that it could offer its own money to settle with Mr. Jenkins. But nothing in the policy or Utah law required Prime Insurance to advise CLJ about this right. *See* pp. 5–9, above; *see also Colony Ins. Co. v. Hum. Ensemble, LLC*, 299 P.3d 1149, 1155–1156 (Utah App. 2013) (rejecting an argument that an insurer had acted in bad faith by failing to advise an insured about an insurance policy because such advice fell "outside the scope of the bargained-for benefits of the insurance contract that [the insured] actually purchased"); *see also Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1240 (Utah 2004) ("While a covenant of good faith and fair dealing inheres in almost every contract, . . . this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante.").

---

[7]    Though Mr. Jenkins sent the offer to CLJ, he asserts—without any citation—that Prime Insurance "fail[ed] to advise CLJ of the April 2014 demand." Appellants' Opening Br. at 49.

13

Even without that requirement, Prime Insurance had already offered the remaining policy limit and told CLJ

- that it could use this money as it "see[s] fit in the defense or settlement of this claim" and

- that it should "consult with counsel regarding these issues."

Appellants' App'x vol. 4, at 256. Given this offer and explanation, Prime Insurance can't incur tort liability for failing to tell CLJ that it could contribute its own funds toward a settlement.

**Imposing conditions on the tender of CLJ's policy limit**

Mr. Jenkins also argues that Prime Insurance acted in bad faith by imposing impossible conditions for settlement. For this argument, Mr. Jenkins points to Prime Insurance's explanation that the tender of CLJ's policy limit was for "full and final settlement of [his] claims." *Id.* at 102. In Mr. Jenkins' view, the parties couldn't settle all of the claims because a nurse might also have committed malpractice in the surgery.[8] But Prime Insurance didn't condition its tender of the policy limit on a release of other possible defendants. Nor did Mr. Jenkins tell Prime Insurance about a potential claim against the nurse.

---

[8]    Before Prime Insurance had tendered its policy limit, Mr. Jenkins' attorney had "made it clear" that he wouldn't settle "against all defendants" for $50,000. Appellants' App'x vol 4, at 3; Appellants' App'x vol. 9, at 206. At that time, the nurse was not a defendant. So Mr. Jenkins had already told Prime Insurance that he wouldn't take $50,000 to settle with CLJ.

In any event, Mr. Jenkins has not pointed to any evidence showing that he would have accepted Prime Insurance's policy limit to settle with CLJ even if the tender had expressly excluded claims against the nurse. So Prime Insurance's request for a "full and final settlement" does not support Mr. Jenkins' claim of bad faith.

* * *

Mr. Jenkins has not identified evidence that would show bad faith. So we affirm the district court's grant of summary judgment to Prime Insurance and Prime Holdings.